UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SHARIQ GHAZNAVI,
               Plaintiff

V.                                               Case No. 8:14-cv-755-T-33AEP

CIRCLE K STORES, INC,
a Foreign Corporation,
               Defendant
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO SUMMARY JUDGMENT

Defendant's Motion for Summary Judgment (Doc. 31) is due to be denied because there are genuine disputes as to material facts, and Defendant is not entitled to judgment as a matter of law. Rule 56(a), F.R.Civ.P.  On such a motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tolan v. Cotton, – U.S. –, 134 S.Ct. 1861, 1863 (2014) (citation and internal quotation marks omitted).  The Court's function is "not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. (citation and internal quotation marks omitted).

### Facts:  Ghaznavi's Education and Prior Work Experience

Plaintiff Shariq Ghaznavi is a 63-year-old American citizen of East Indian descent.  (Doc. 31 at 1).  He holds a Bachelor's Degree in Business & Agriculture from Rajandranagar University in Hyderabad, India (Doc. 39-1 at 6, 22:19 to 23:8).[1]  After graduation from college, Ghaznavi spent nineteen years in Jamaica, working as Agricultural Manager and then General Manager of a large

_____

[1]Deposition transcripts are cited in this Response by first stating the Court docket number, then the page of the court docket number, followed by the page and lines where the cited testimony appears in the transcript.   For example, in the above citation, the testimony is located from page 22, line 19 to page 23, line 8 of the deposition transcript, which is found in the Court record at Doc. 39-1, page 6.

sugar plantation, and then in various governmental management positions, including Director of the country's Self-Sufficiency Program (Doc. 39-1 at 14-15, 53:21 to 54:20, 55:21 to 56:11 57:4-19).

After coming to the United States, Ghaznavi worked for Amoco, starting as an entry-level cashier and advancing quickly to Assistant Manager and then Store Manager (Doc. 39-1 at 5, 19:4-7; Doc. 39-1 at 15, 59:20-24; Doc. 39-1 at 16, 61:7-21).   Within another two years, he became a Multi-Manager in charge of two stores, and continued in that capacity when British Petroleum (BP) acquired the stores in 2000.  (Doc. 39-1 at 15-16, 59:25 to 60:3,, 62:11-22 and 63:10-16).  He left BP for a time to start his own business leasing and managing several gas stations, and then returned to BP in 2009. (Doc. 39-1 at 16, 64:20-24).  In March of 2010 Florida Oil, which had acquired BP's 29 Florida stores, moved Ghaznavi to Orlando to serve as District Manager responsible for 15 BP stores (Doc. 39-1 at 17, 65:4-17; Doc. 39-2 at 2).  He trained store managers in all aspects of store management, including back office paperwork, inventory control and store ordering.  (Doc. 39-3 at 1).

Plaintiff was one of two regional managers supervising Florida Oil's 29 BP stations at the time they were acquired by Defendant Circle K in 2012.  (Doc 31 at 2, Doc. 39-1 at 7, 25:9 to 27:14).

### Ghaznavi's Transition to Circle K

After Circle K acquired the BP stores, it put Ghaznavi through an application and  interview process before he was hired on August 27, 2013 as a Market Manager, which was equivalent to the District Manager position at Florida Oil. (Doc. 39-1 at 7-8, 28:8 to 29:14).  Ghaznavi was responsible for eight stores and reported to John Venuti, the Retail Operations Director (ROD) for his region. (Doc. 31 at 2; Doc. 39-1 at 9, 33:21 to 34:3).   As Defendant's Florida HR Director Christie O'Halloran admitted, Ghaznavi was very familiar with the BP systems and assisted Defendant in the transition of the 29 former BP stores and their employees to the new system and culture of Circle K. (Doc. 37-1 at 4 10:1-13).

On October 8, 2013, Ghaznavi began his training in Circle K operations with his mentor, Thadd Crowell.  (Doc. 39-1 at 9, 12, 35:23 to 36:23, 47:24 to 48:7).   Crowell signed off on Ghaznavi's completion of his training in early December of 2013.  (Doc. 39-1 at 13, 50:20-25).

At that time, Venuti was replaced by Rebecca Thompson as the ROD of Ghaznavi's region. (Doc. 39-1, page 19, 74:21 to 75:2).  As Venuti had not yet signed off on Ghaznavi's training, that responsibility fell to Thompson, and Venuti had no further involvement.  (Doc. 39-1, page 13, 50:1-17; Doc. 37-1 at 10, 35:9-13).

### Ghaznavi's Jarring First Meeting with Thompson

Plaintiff's first one-on-one encounter[2] with Thompson, his new boss, was on December 13, 2012.  (Doc. 39-1, page 22, 86:4-6).  It was a "ride-along"where Thompson accompanied Ghaznavi on a tour of the stores in his territory.  (Doc. 39-1, page 22, 86:11-23).   Thompson was on the telephone taking calls for most of the time while they were riding in the car.  (Doc. 39-1, pages 22-23, 88:24 to 89:5).   They stopped for lunch at a Subway restaurant.  (Doc. 39-1, page 22, 87:20-22). During lunch, Thompson told Ghaznavi that she once had a bad experience with a Pakistani, adding that she does not like Pakistanis.  (Doc. 39-1, page 22, 88:4-18).  Plaintiff responded, "You think that I'm a Pakistani?  I'm from India." (Doc. 39-1, page 22, 88:19-20).  Thompson then said, "Whatever," and started eating.  (Doc. 39-1, page 58, 231:11-17).   Defendant admits that Thompson brought up her bad experience with a Pakistani during the the ride-along with Ghaznavi.  (Doc. 31 at 2-3).  HR Director O'Halloran admitted that Thompson's little anecdote was a "stupid story" and her reference to the Pakistani nationality was "unfortunate."  (Doc. 37-1 at 11, 39:4-20).

Other, non-Asian employees traveled with Thompson, but Thompson did not choose to

---

[2]Ghaznavi's only previous contact with Thompson was a brief telephone call and a group meeting with all the Market Managers under her supervision.  (Doc. 39-1, page 19, 73:22 to 74:10 and 75:19 to 76:14).

mention her bad experience with the Pakistani man to them.  (Doc. 36-1 at 16, 59:5 to 60:1: Doc. 37-1 at 18, 67:2-6).  Thompson testified that Ghaznavi was the only Asian employee who ever reported to her in her twenty years as Regional Operations Director at Circle K.  (Doc. 38-1 at 17, 64:4-9).

### Thompson Acts on Her Hostility to Ghaznavi

Later that day (December 13, 2012), Thompson queried Ghaznavi about the number of hours he worked on a daily basis.  (Doc. 39-1, at 23-24, 92:2 to 93:5).  Plaintiff responded that he started at 5:00 a.m., working on his company laptop from his home,[3] and from about 7:00 to 3:00 he was on the road visiting stores, and then he returned home for about an hour's work on his laptop.  *Id.* Thompson said she did not approve of that schedule, stating that he should not being going home until 4:00 or 5:00.  *Id.*   Ghaznavi agreed he would not go home before 4:00, and from then forward he followed that practice.  (Doc. 39-1, page 24, 93:1-5).

In fact, there was no requirement to be on the road after 3:00 p.m., and Thompson admitted in her deposition that she would not have a problem with a market manager beginning work early in the morning and working only until 3:00 p.m.  (Doc. 38-1 at 26, 100:25 to 101:16).

After expressing her dislike for Pakistanis to Ghaznavi, Thompson was "very rude"to him in future interactions.  Doc. 39-1, page 25, 4-11).  She was frequently sarcastic and indicated she did not believe him when he answered her questions.  (Doc. 39-1, pages 25-26, 100:20 to 101:19).

Arnold Wolberg, a store manager in Ghaznavi's region, witnessed interactions between Thompson and Ghaznavi and was "shocked at the rudeness and hostility that Ms. Thompson showed to Mr. Ghaznavi."  (Doc. 48-1, ¶5).  Rather than addressing Ghaznavi by name, Thompson regularly addressed him with "Hey, you" and "Hey you, come over here."  On one occasion Wolberg heard

---

[3]Market Managers do not have a physical office and spend much of their time on the road visiting stores.  (Doc. 38-1 at 4, 11:4-9).

Thompson call to Ghaznavi, "Hey, Paki." (*Id.* ¶¶6-7).  Thompson made other insulting comments to Ghaznavi, including "I don't even know why you're a market manager." (*Id.* ¶7).

Thompson also took Ghaznavi to task because he did not submit weekly activity reports. (Doc. 31 at 3).  Plaintiff explained that the reports were not required by Venuti, his previous ROD, so he assumed they were not necessary. (Doc. 39-1, pages 28-29, 112:12 to 113:19).  Thompson had been unaware of this. (Doc. 38-1 at 11, 38:8-21).  After Thompson informed him on Sunday, January 20, 2013 that she wanted the reports (Doc. 39-10), Ghaznavi began doing them regularly, and in addition provided reconstructed reports for previous months that same day. (*Id.*; Doc. 39-11).

On January 24, 2013, Thompson and Ghaznavi were working to organize a display at one of the former BP stores, and there was only one employee on the cash registers and the customer line was growing. (Doc. 39-1, page 26, 102:5 to 104:17).  Although there was another clerk in the store, Thompson ordered Ghaznavi to open another line and operate the cash registers himself.  *Id.* Gahznavi responded that he was unable to do it because he had not been trained on the separate cash register ("Ruby" system) for gasoline purchases.  *Id.*  He solved the problem by going into the back of the store and bringing the other clerk out to open the second customer line.  *Id.*  Thompson then stated that she was going to assign Ghaznavi to a store to be trained as a store manager.  *Id.*

Ghaznavi recognized that there were occasions when a manager would need to jump in and operate a cash register. (Doc. 39-1, pages26-27, 104:18 to 105:5).  Although such occasions are rare – Thompson testified that she had to jump in and operate a cash register about once or twice a year[4] – Plaintiff was not resistant to doing so.  *Id*.  Once Defendant provided him with the training on the Ruby system, he picked it up quickly and had no problems with it. (Doc. 35, page 3, 9:11-16; (Doc.

---

[4] (Doc. 38-1 at 12, 42:19 to 43:14). Thompson testified she did not know how often, on average, a Market Manager would need to operate a cash register.   (Doc. 38-1 at 43:20-23).

48-2, ¶5).  At least one other Market Manager, Debra Stieber,[5] was unable to operate the cash register. (Doc. 35, page 6, 20:8 to 21:12).  Thompson admitted in her deposition that Ghaznavi learned the Ruby system.  (Doc. 38-1 at 13, 47:15-18).

Ben Vahedian was the Store Manager of one of the stores in Ghaznavi's region.  (Doc. 33-1 at 3, 7:4-11).  Circle K used Vahedian as a trainer for store managers on store operations and knowledge of the systems, including TDL and Ruby.  (Doc. 33-1 at 4-5, 12:15-17 and 13:25 to 14:12). He showed Ghaznavi how to operate the back office computer systems, and after his first two to three weeks as Market Manager, Vehedian testified that Ghaznavi did not have any problems operating the back office systems.  (Doc. 33-1 at 5-6, 15:6-12 and 20:2-25).

Arnold Wolberg, another Store Manager in Ghaznavi's region, similarly states that Ghaznavi was an effective Market Manager and was helpful to him.  (Doc. 48-1, ¶4).

### Thompson Takes Ghaznavi's Car and Laptop and Demotes Him

On or about January 27, 2013, Thompson told Ghaznavi, "I want your car.  I want your laptop. I want your phone.  I want your gas card.  I want it back on Monday morning on my table."  (Doc. 39-1 at 32-33, 128:14 to 129:11;  Doc. 38-1 at 15-16, 57:19 to 58:2).  Ghaznavi asked Thompson why she was doing this, and she stated she was demoting him to a Market Manager Trainee. (Doc. 39-1 at 33, 129:7-14).  She stated that she was going to reassign Ghaznavi to a store for Store Manager training and that, in addition to learning the cash register, he also needed to learn the back office paperwork system.  (Doc. 39-1, pages 27-28, 108:23 to 109:19).  Ghaznavi pointed out that he did know the back office paperwork system, that he had been working with Vahedian to learn it, and that Thompson had not sat with him and observed him or tested his knowledge of the system.  *Id*.

---

[5] Stieber was a Market Manager who took over Ghaznavi's position temporarily when Thompson removed him from that position on February 4, 2013.  (Doc. 39-1 at 39, 154:14-21).

Thompson followed on February 4, 2013 with a "Performance Improvement Plan" which stated that the reasons for the demotion were Ghaznavi's failure (since corrected) to file the weekly reports and that he was "struggling with the technical side of the business."   (Doc. 31-15). Thompson then placed Ghaznavi in Store 7560 in Polk City, Florida, and told him that the store manager there, Linda Whitaker, would train him in the store manager job.  (Doc. 39-1 at 34, 133:21 to 134:16).  Whitaker was to train Ghaznavi for two weeks, and then transfer out, leaving Ghaznavi to run the store for an additional period of six weeks, culminating in an audit of the store's operations. (Doc. 39-1 at 34, 136:12-24 and 43, 169:17 to 170:8).

Assignment to work in the capacity of store manager is a standard part of Defendant's training for candidates who are new to the market manager position, but not for "acquisition employees" such as Ghaznavi, who come to Circle K after having been a market manager for another company.  (Doc. 37-1 at 9-10, 33:9-13 and 34:15 to 35:8).  As HR Director O'Halloran testified, the approach to the latter is "a little different," in that both Ghaznavi and the other Market Manager who came to Circle K with the acquisition of the BP stores simply "were given a trainee book and were expected to complete that successfully."  *Id.*  The decision to put Ghaznavi in a store manager position for several weeks came not from John Venuti, who supervised his training for the first three months, but from Thompson.  (Doc. 37-1 at 10, 35:9-13).

### Ghaznavi Excels in Assignment to Train in Store Manager Tasks

Linda Whitaker was the store manager of the Polk City store when Ghaznavi arrived there. (Doc. 35, page 3, 7:4:10).  She was a "strong leader" and a "strong trainer," according to Thompson. (Doc. 38-1 at 16, 58:12-20).  Whitaker was assigned to train Ghaznavi in the daily operations of a Circle K store, including the daily paperwork and cash register operation, and serve as his mentor. (Doc. 35, page 3, 9:4-7; Doc. 36-1 at 10, 34:3-9).  She had been trained by Defendant to be a trainer

for these functions.  (Doc. 35, page 3, 8:10-25;  Doc. 38-1 at 16, 59:3-8).  Her training of Ghaznavi lasted for two to three weeks (Doc. 35, page 7, 22:5-13;  Doc. 38-1 at 16, 59:13-16).

According to Whitaker's testimony, she spent the first couple of days training Ghaznavi in the cash register and he picked it up quickly to the point where his operation of the machine was "perfect."  (Doc. 35, page 3, 9:11-16).  Next, she proceeded to train him on the paperwork, and "he caught on really quick with that."  (Doc. 35, pages 3-4, 9:22-25 to 10:14).  As Ghaznavi progressed, she reviewed his paperwork and found no deficiencies.  (Doc. 35, page 4, 10:6-14).

Ghaznavi successfully completed the store manager training; by the end of the training, Whitaker concluded that he "knew everything that he should know."  (Doc. 35, page 4, 10:17-23).  Ghaznavi had already completed the classroom portion of store manager training back in October of 2012.  (Doc. 38-34).  Whitaker reported on Ghaznavi's successful completion of the training to Market Manager Debra Steiber, who had assigned her to train Ghaznavi.  (Doc. 35, pages 3-4, 7:5-23, 13:4-17).  At this time, on February 18, 2013, Whitaker was removed from the store and Ghaznavi took over as Store Manager.  (Doc. 39-1, page 36, 144:1-22).

After Whitaker left and Ghaznavi took full responsibility for running the store and occupying the small office in the store, Thompson had a video monitoring camera installed in the manager's office.  (Doc. 31 at 8;  Doc. 38-1 at 35, 137:15-23).  There was no video camera in the office of the Polk City store while Whitaker was store manager.  (Doc. 35, page 4, 13:18-24;  Doc. 38-1 at 36, 138:12-14).  There was never any discussion of a need for a video camera, and in fact Whitaker did not see a need for one.  (Doc. 35, pages 4-5, 13:25 to 14-10).  Whitaker testified that given the small size of the office and the location of the camera, the only function the camera could serve was "just to watch the Manager."  (Doc. 35, page 7, 23:8-19).  With the installation of the camera, Thompson began "monitoring me on the camera like I'm an animal in a cage."  (Doc. 39-1 at 18, 69:9-15;  Doc.

39-1 at 37-38, 148:24 to 149:5).  Staff joked with Ghaznavi that he was "a star now, she's going to watch you day and night, good luck to you."  (Doc. 39-1 at 39, 153:10- to 154:2).  Defendant has other offices that do not have such video cameras; one of the stores Whitaker worked in, the Auburndale store, does not have a camera in the office.  (Doc. 35, page 5, 14:11-23).

Store 7560 was not in good shape when Ghaznavi arrived there; it was "filthy and horrible." (Doc. 39-1 at 40, 158:7-11).  A Circle K mystery shopper report on February 7, 2013, when Ghaznavi had just arrived and Whitaker was still running the store, gave the store a score of 76%, a very poor score.  (Doc. 38-1 at 23, 87:5 to 88:18; Doc. 38-37).  A "Communications Planner"[6] completed by Market Manager Tammy Craft on February 8, 2013 noted several deficiencies, including a need to maintain the floors, maintain "fronting" of products, and  fill "holes" (gaps created when items were missing because the shelves had not been restocked) in the cooler, candy aisle, and other areas.  (Doc. 31-16).  Craft directed that all of the "holes" be fixed by the end of the week.  *Id.*  The document was signed by Linda Whitaker, indicating that she was still the responsible store manager.  *Id.*

Thompson admitted that the cleanliness of the store improved after Ghaznavi took over management of the store from Whitaker.   (Doc. 38-1 at 16, 60:14-19).  In addition, store employee Genevieve Conticello confirms that when Ghaznavi took over the store he "did a good job" and "was a great person to work for."  (Doc. 48-2, ¶6).

Tammy Craft was the Market Manager for the area which included Store 7560.  (Doc. 39-1 at 39, 155:4-7; Doc. 31-16 (listing Craft as Market Manager for Store 7560)).  Craft visited the store two to three times a week while Ghaznavi was store manager there.  (Doc. 39-1 at 39, 155:4-11).

### Thompson Undermines Ghaznavi in Store Manager Role

---

[6]Communications Planners are notes made by the market manager when she visits a store, telling the store manager what needs attention in the store.  (Doc. 39-1, page 35, 138:23 to 139:4).

Thompson told Ghaznavi's Assistant Store Manager, Margi Chapman, not to help him learn the systems there. Chapman told the store employees that Thompson said not to assist Ghaznavi with anything in the store. (Doc. 39-1 at 17-18, 68:16-25 to 69:1). This is confirmed by the Declaration of Genevieve Conticello, who was employed at the Polk City store during the entire period that Ghaznavi was there. (Doc. 48-2, ¶¶ 3-4). She reports that although it was common for managers new to a store to rely on staff for much information, Chapman told the staff that she was told that none of them should help Ghaznavi, and that if he had a question, "don't answer it, let him figure it out for himself." (Doc. 48-2, ¶¶ 7, 10).

Shortly thereafter, on March 18, 2013, Craft gave Ghaznavi a write-up for failing to submit a weekly cigarette pricing survey for two weeks in a row. (Doc. 31-21). It turned out that Assistant Manager Chapman, who had been doing the cigarette surveys since before Ghaznavi arrived at the store, stopped doing them after Thompson told her not to help Ghaznavi. (Doc. 39-1 at 44-45, 176:9 to 178:2) (Doc. 40-1 at 5, 19:3 to 20:12) (Chapman Depostion). Until then, the reports had regularly been completed. (Doc. 38-1 at 32, 125:225). Chapman did not tell Ghaznavi that she had stopped, and Craft did not tell him after the first week that she did not receive the survey report. *Id.* It is not required that the store manager personally do the survey (Doc. 36-1 at 7, 23:15 to 24:19), and Thompson admitted that it is appropriate to have the assistant store manager do it. (Doc. 38-1 at 17-18, 64:10 to 66:10). Conticello confirmed that it was Chapman's job to do the cigarette survey. (Doc. 48-2, ¶ 12). Moreover, the standard penalty for the first offense of failure to submit a cigarette pricing survey was a verbal counseling, not a write-up. (Doc. 38-1 at 33, 126:1-9).

Like the cigarette pricing survey, other documentation and reporting responsibilities which would normally be shared between store manager and assistant manager were dumped on Ghaznavi. (Doc. 39-1, 222:25 to 224:8). This created so much stress for Ghaznavi that he had an anxiety attack

while driving to the bank to make a store deposit.  *Id.*  He broke out in sweats and had to pull over

and stop the car.  *Id.*  He telephoned the store and spoke to Craft.  *Id.*  He told her his situation and

asked her to send someone to pick up the cash bag and take it to the bank.  *Id.*  After half an hour

passed and no one came, Ghaznavi drove slowly to the bank to make the deposit.  *Id.*

Thompson and Craft papered Ghaznavi's file with petty complaints.  Rather than walking the

store with Ghaznavi and discussing her observations, as a visiting manager generally would do, they

walked the store alone and just left written comments for Ghaznavi.  (Doc. 39-1 at 46, 181:12 to

182:3).  Genny Conticello, a store employee, witnessed some of Thompson's visits to the store and

confirms the above in her Declaration.  (Doc. 48-2, ¶¶ 13-14).  The notations were mostly negative,

and sometimes they were false.  (Doc. 39-1, page 18, 70:8-13).  When Ghaznavi objected to the

inaccurate notations, Thompson got angry and Ghaznavi felt he had no choice but to sign them.  *Id.*

HR Director O'Halloran admitted that there is no expectation to find everything in perfect order on

a store visit, because there is no perfection in a retail environment.  (Doc. 37-1 at 9, 30:9-14).

Thompson and Craft visited the store together on March 18, 2013.  (Doc. 39-27 at pages 3-4).

Thompson was rude and hostile.  *Id.*  Ghaznavi told her that the store's sales had gone up 17% in the

past week, and had increased every week he had been in charge.  *Id.*  Thompson responded, "Are you

fishing for a compliment?  You are getting none from me."  *Id.*  Thompson added, "I don't think you

will make it.  You have two weeks left."  *Id*.

### Ghaznavi Files an EEOC Charge

On March 25, 2013 Ghaznavi filed a Charge of Discrimination with the EEOC, alleging that

Circle K was discriminating against him because of his national origin, race and age.  (Doc. 39-7).

Thompson was informed of the Charge on April 1 or 2.  (Doc. 38-1 at 28, 108:3-9).  Within days after

the Charge was filed, Craft came to the store and met with Ghazanavi and Assistant Manager

Chapman. (Doc. 39-1 at pages 47-48, 188:20 to 189:20). Craft stated that he was a good manager and that she was there to support him, and Chapman was there to support him as his assistant manager. *Id.* Chapman stated that Thompson had told her not to support Ghaznavi, and Craft responded that she had "misunderstood." (*Id.*; Doc. 40-1 at 5, 19:3-18).

O'Halloran also met with Plaintiff after he filed the Charge. (Doc. 39-1 at 48, 191:23 to 192:9). She asked Ghaznavi what he wanted, in terms of money, and Ghaznavi responded that he was not looking for money but rather to get his job back and work under someone other than Thompson. (Doc. 39-1 at 49, 103:9-24). O'Halloran responded that he would be returned to his Market Manager job after he completed after a successful audit, but he would have to continue under Thompson. *Id.*

A short time later the audit was conducted and Craft informed Ghaznavi that the results were positive. (Doc. 39-1 at 50-51, 198:25 to 199:6, 201:23 to 202:13). The audit computes dollar shortages as a percentage of total store sales; the standard is 0.58%. (Doc. 38-1 at 21-22, 80:24 to 82:8). Plaintiff's store was well within that standard at 0.4%. (Doc. 39-1 at 51, 201:17 to 202:16).

### Thompson Replaces Ghaznavi with White Male Trainee

After the audit was completed, Ghaznavi again requested on April 11, 2013 that he be returned to his Market Manager position. (Doc. 31 at 8; Doc. 39-1 at 51, 203:15 to 204:21). He made the request to Craft, who responded that Thompson would get back to him "when she's ready," and that he should continue working as a store manager. *Id.*; (Doc. 36-1 at 12, 42:18-23) (Craft deposition).

Two days later, on April 13, 2013, Craft told him that he would not be returned to his Market Manager position. (Doc. 39-1 at 51, 204:13-21). After the audit of Ghaznavi's store, and after he asked to be returned to his Market Manager position, Thompson instead placed John Rowland, a white male trainee, in Ghaznavi's position on April 19, 2013. (Doc. 31 at 8; Doc. 39-1 at 27, 105:11-16; Doc. 39-1 at 52, 205:2-3).

## Ghaznavi Receives High Marks from Unbiased Evaluators

Defendant has several systems which assess the appearance and performance of their stores through independent evaluators outside the normal chain of command.  There is a financial audit, a quality assurance visit by a "mystery shopper," and a more extensive food service visit.  (Doc. 38-1 at 22, 82:9 to 83:3).  Passing score on the mystery shopper and food service visits, which are done by an external company, is 94%.  (Doc. 38-1 at 22, 83:13-22).   Each time Ghaznavi's store was assessed by one of these neutral parties, it surpassed this standard and received glowing reviews.

During the week ending on March 2, 2013, Ghaznavi's store scored 100% on an audit measuring whether items were properly "in stock." (Doc. 38-1 at 22, 84:18 to 85:7).  The audit was conducted by personnel who were not subject to Thompson's authority. (Doc. 38-1 at 22, 85:14-16).

On March 8, 2013,Ghaznavi's store was audited for food service, including the overall image of the store, its customer service, the appearance of staff, and the handling of beverages and food. (Doc. 38-1 at 22-23, 85:21 to 87:5; Doc. 38-35).  The store scored 97.5 on the audit, which Thompson admits was a very good score and meets Circle K standards.  (Doc. 38-1 at 23, 86:11-16).

These outside evaluations are given great weight by Defendant.  The record reveals that  Store Manager Leon Dawson was given a counseling after he received a score of less than 95% on an audit of shelf stocking performance. (Doc. 49-3 at 12).   Store Manager Linda Whitaker was demoted after a negative mystery shopper report.   (Doc. 38-1 at 16, 60:2-13).   Another manager was suspended and demoted when she received a bad review from a mystery shopper and two bad audits of shelf stocking practices.  (Doc. 35, page 3, 6:2-23).

## Thompson Takes Steps to Formally Demote Ghaznavi to Store Manager

These highly successful audits were the only audits on Ghaznavi's store while he was in charge.  (Doc. 38-1 at 90:6-22).  Shortly after these favorable audits, Thompson proposed on March

27, 2013 that Ghaznavi be formally demoted to store manager.  (Doc. 38-1 at 28, 107:18 -24).  The detailed written recommendation, with a covering e-mail stating, "I plan to demote Gaz tomorrow," elaborates on  several critical "communication planner" notes from Thompson and Craft, but makes no mention of the recent, glowing outside evaluations.  (Doc. 38-7).

Thompson testified that the reason for the demotion memo had nothing to do with Ghaznavi's failure to submit weekly reports, because he had long since corrected that.  (Doc. 38-1 at 29, 111:23 to 112:6).  Rather, Thompson testified, she asserted that it was based on the conditions she and Craft observed in the store, and the financial and cash reports he prepared.  *Id.*

As set out above, the reports of the unbiased auditors gave high marks to Ghaznavi for the condition and stocking of the store.  Similarly, when Ghaznavi's command of the cash register and the back office operating system were measured by Circle K's lead auditor and a trainer, they signed off on his completion of the Market Manager training in these systems and his understanding of them.  (Doc. 38-20; Doc. 38-1 at 12-13, 44:6 to 46:1).  The checklist for this assessment included TDL reports, audit trails, researching losses, and other elements of cash management and financial reporting. (Doc. 38-20).  Thompson admitted that the auditor would not have signed the checklist of skills unless Ghaznavi had demonstrated his understanding of the system. Doc. 38-1 at 12-13, 44:6 to 46:1).

As Defendant had just received Ghaznavi's EEOC Charge, O'Halloran told Thompson to "back off a little bit" and wait before she proceeded with the demotion.  (Doc. 38-1 at 110:10-20).

On April 26, 2013, Thompson resubmitted her plan to demote Ghaznavi.  (Doc. 38-15).  She was "ready to go with it" when the cash handling issue arose on April 30, and the decision was made to fire, rather than demote Ghaznavi.  (Doc. 38-1 at 31, 118:10 to 119:17).

### Thompson Fires Ghaznavi

On April 30, 2013, Ghaznavi went to make a store bank deposit and left some cash unattended in a bag in a plastic bin in his private office. (Doc. 39-1 at 53, 209:15-23; Doc. 31 at 8). Craft came to the store and discovered the bag. (Doc. 39-1 at 53, 209:24 to 210:11). Craft said she would have to give him a write-up because leaving cash unattended was a violation of company policy. (*Id.*; Doc. 31 at 8). Craft prepared a write-up, signed it and gave it to Ghaznavi. (Doc. 39-1 at 53, 210:10-22; Doc. 31 at 9). She also sent a copy to Thompson. (Doc. 36-1 at 14, 52:5-10). Ghaznavi recognized that leaving cash unattended was a policy violation, apologized for his error, and accepted the write-up. (Doc. 39-1 at 210:8-9). The signed write-up is in the record as Doc. 38-33.

At the time she issued the write-up, Craft was serving as a backup Market Manager. (Doc. 36-1 at 4, 12:3-6). She had been a manager with Circle K for more than ten years, and had previously served as a backup Market Manager. (Doc. 36-1 at 3-4, 9:19 to 10:3; Doc. 36-1 at 6, 18:23 to 19:3). A backup Market Manager fills a Market Manager position temporarily when a Market Manager position is vacant. (Doc. 36-1 at 4, 11:8-18). Like a permanent Market Manager, she gets a company car and laptop computer, does all the functions of a Market Manager and has authority to sign off on things as a Market Manager. (Doc. 36-1 at 4, 12:7 to 13:11). Craft had previously exercised her authority as backup Market Manager to issue a write-up to Ghaznavi regarding the cigarette price survey. (Doc. 36-1 at 22:9-18; Doc 36-2). As backup Market Manager, she was responsible for ten stores, including Ghaznavi's store. (Doc. 36-1 at 4-5, 13:25 to 14:3). Thompson admitted that a Market Manager has authority to discipline a Store Manager, and that Ghaznavi was serving as a Store Manager at that time. (Doc. 38-1 at 34, 131:10-12, 132:3-9). O'Halloran testified that Craft was "a tenured Store Manager who knows what she's doing, and was in the role of acting Market Manager for that reason." (Doc. 37-1 at 14, 52:16-20).

Craft then left the store. (Doc. 39-1 at 53, 210:10-19). Later that day, she returned and told Ghaznavi that Thompson told her that instead of giving Ghaznavi the write-up, she wanted Craft to suspend him pending investigation. *Id.* Craft added, "there's nothing I can do. She's the ROD." *Id.* Craft counted the money in the store and confirmed that none was missing. (Doc. 39-1 at 53, 210:25 to 211:6). Ghaznavi turned in his keys and left the store, as instructed. *Id.* He was placed on unpaid leave. (Doc. 38-1 at 34, 132:19 to 133:3). Craft was not disciplined for what Defendant contends was her improper handling of the incident. (Doc. 38-1 at 34, 133:12-14).

Thompson conferred with O'Halloran, the HR Director for the Florida region, and with "Jerry Bailey with Circle K Loss Prevention." (Doc. 31 at 9). They decided that Ghaznavi would be discharged. *Id.* On May 3, 2013, Ghaznavi was summoned to a meeting with Thompson and O'Halloran. Thompson told him he was terminated for violating the cash handling policy. (Doc. 31 at 9; Doc. 38-1 at 17, 63:6-8; Doc 39-1 at 54, 213:14 to 214:4). This was the only reason cited by Defendant for discharging him. (Doc. 31 at 15). Thompson testified that the amount of cash involved ($780) did not factor into the decision to discharge Ghaznavi. (Doc. 38-1 at 36, 140:4-15).

## Legal Argument:  Discriminatory Discharge

As Defendants acknowledge, one way to establish discrimination in employment is by utilizing the framework originally set out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 804-805 (1971). (Doc. 31 at 11-13). Under that framework, the plaintiff states a *prima facie* case of disparate treatment by showing that (1) he is a member of a protected class, (2) he was qualified for the job, (3) he was discharged and (4) he was replaced by a person outside the protected class. <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1185 (11th Cir. 1985); <u>Cuddeback v. Florida Board of Education</u>, 381 F.3d 1230, 1236 (11th Cir. 2004); <u>Crowley v. OSI Restaurant Partners</u>, 907 F.Supp.2d 1318, 1324 (M.D.Fla. 2012); *see*, <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506

(1993); Chapman v. A-1 Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*) (ADEA case).

If the Plaintiff was not replaced by a person outside the protected class, or was not replaced at all, then he may still meet the fourth prong of the *prima facie* case by showing instead that similarly situated comparators were treated more favorably than he. Nix, 738 F.2d at 1185-86; Horn v. United Parcel Services, 433 Fed.Appx. 788, 792 (11th Cir. 2011). Here Ghaznavi can show that he has established a *prima facie* case under both tests.

The employee's burden in establishing a *prima facie* case of disparate treatment is "not onerous." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). Ghaznavi establishes the elements of the *prima facie* case of discriminatory discharge as follows:

(1) Ghaznavi, as a person born and raised in India, is within a class protected by the prohibition in Title VII of discrimination based on national origin.[7] Espinoza v. Farah Mfg. Co., 414 U.S. 86, 88 (1973) ("term 'national origin' [in Title VII] on its face refers to the country where a person was born"). As a person of Asian descent and ethnic characteristics he is within a class protected by the 42 U.S.C. §1981. Banker v. Time Chemical, 579 F.Supp. 1183, (N.D.Ill. 1983).

(2) Ghaznavi was qualified for the jobs of Market Manager and Store Manager, both of which he had successfully performed in prior employment. *Supra* at 2. Moreover, Defendant endorsed Ghaznavi's qualifications for the Market Manager position by hiring him after examining those qualifications, and has not argued that he suffered a loss of a necessary professional certification or a physical disability since that time. *Id.*; Berquist v. Washington Mutual Bank, 500 F.3d 344, 349-50 (5th Cir. 2007). Ghaznavi's trainer/mentor for the Store Manager job testified that he was also qualified for that job. *Supra* at 8.

(3) Ghaznavi was discharged, as Defendant admits. (Doc. 31 at 9).

_____

[7]Plaintiff's age discrimination claim was voluntarily dismissed by stipulation. (Doc. 46).

(4) Ghaznavi was replaced by a person outside the protect class – John Rowland, a white male – as Defendant admits.  (Doc. 31 at 8).

Defendant argues that as part of his *prima facie* case, Ghaznavi must produce evidence that similarly situated comparators were treated more favorably than he. (Doc. 31 at 13).  The is manifestly not the law.  Numerous decisions of the Supreme Court and the Eleventh Circuit Court of Appeals in discriminatory discharge cases have applied a version of the *prima facie* case which includes replacement by a person outside the protected class, but not comparators.  *Supra* at 16.  Two of the cases upon which Defendant relies – Cook v. CSX Transportation Corp., 988 F.2d 507, 510 (4th Cir. 1993) and Jones v. Gerwens, 874 F.2d 1534, 1537 (11th Cir. 1989) – involved discipline short of discharge, so there was no question of the plaintiff's being replaced by anyone, and the test of whether the plaintiff was replaced by a white person was clearly inapplicable.  The third case is the Nix case upon which Plaintiff relies, and it states that there are several alternative ways to satisfy the fourth prong of a *prima facie* case of discrimination, including the method used by Plaintiff herein.

Notwithstanding the fact that comparators are not required as part of a *prima facie* case of discriminatory discharge, Plaintiff can meet that test by pointing to comparator evidence that numerous other managers who committed the same infraction as he did were not discharged.  This evidence is set out in detail in the discussion of pretext, *infra* at pages 19-21.

Plaintiff's *prima facie* showing shifts to the defendant the burden to proffer evidence that its challenged actions were taken for legitimate, nondiscriminatory reasons.  Burdine, 450 U.S. at 252.  Here, Defendant's only proffered reason for discharging Ghaznavi is that he left a bank deposit unattended.  (Doc. 31 at 15).  This proffer by the Defendant shifts the burden back to the plaintiff to show that the proffered reason was a pretext for discrimination.  Burdine, 450 U.S. at 256.

Pretext may be shown in a variety of ways, including evidence of the employer's treatment

of similarly situated comparators, its treatment of the plaintiff throughout his employment, biased remarks by the decision-maker, its reaction to plaintiff's legitimate anti-discrimination activities, or evidence that its proffered reason is "unworthy of credence."   Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 143, 152-53 (2000);  McDonnell Douglas, 411 U.S. at 804-05.

Defendant's cash-handling procedures state that "store money must not be left unattended." (Doc. 39-19).  They warn that "violation of any or all of these procedures are grounds for disciplinary action, which may include termination."  (Doc. 39-19; Doc. 31 at 8).  Defendant follows a system of progressive discipline, with actions ranging in severity from an oral counseling, a written counseling, suspension and termination.  (Doc. 38-1 at 10, 36:3 to 37:1).  As shown below, Defendant has followed this policy and has imposed discipline short of termination on numerous managers for cash-handling violations similar to Ghaznavi's violation.  Indeed, Thompson admitted that she herself has not terminated all employees with cash handling violations.  (Doc. 38-1 at 7, 23:3-8).

At her deposition, Thompson testified that she could remember three store managers in her region, besides Ghaznavi, who had left cash unattended.  (Doc. 31 at 9-10).  Two of the three violators under her supervision were not discharged by Thompson for their first violation, as Ghaznavi was.  Thompson was a decision-maker in each case.  (Doc. 38-1 at 8, 27:6-16).  The three employees are Connie Wright, Charlotte C. Naeimi-Hossany and Myra J. Alton.  (Doc. 31 at 9-10).

As Defendant admits, prior to being fired, Connie Wright "had left money unattended on several occasions," and her Market Manager had been aware of these prior violations, but had not fired her.  (Doc. 31 at 10).  As Thompson put it, Wright "would prepare the deposit and then leave the money unsecured and go out onto the sales floor, and she was caught numerous times leaving money laying around in the back room unsecured."  (Doc. 38-1 at 7-8, 25:21 to 26:5).

Naeimi-Hossany was not fired even though she left cash unattended and it was discovered by

Thompson herself. (Doc. 31 at 10). In Defendant's motion, the violation is depicted as a technical violation in which Naeimi-Hossany "did not really leave cash unattended," but left it in a desk drawer, where it was discovered by Thompson when she was using the desk during a visit. (Doc. 31 at 10). However, in the contemporaneous Counseling Notice which Thompson wrote for the violation, she stated that Naeimi-Hossany "had daily deposit hidden behind desk in office and not secured in the safe or atm." (Doc. 48-3 at 26). As Thompson testified in her deposition, Naeimi-Hossany admitted that she should have put the money in a secure place but failed to do so. (Doc. 38-1 at 7, 24:7-22). Thompson did not discharge her, but merely gave her a warning that the next violation "would result in suspension and up to termination." *Id.* This occurred in October of 2013. *Id.*

This situation is not materially distinguishable from Craft's discovery of the deposit bag in Ghaznavi's office. As in the case of Naeimi-Hossany, Ghaznavi left a deposit unattended in his private office. As in the case of Naeimi-Hossany, no funds were lost or stolen. As in the case of Naeimi-Hossany, Ghaznavi was given a warning that "if this happens again you will be terminated." (Doc. 38-33). The only difference is that in Ghaznavi's case Thompson, with her known animus toward Ghaznavi because of his national origin and because he had filed an EEOC charge implicating her, undid the written warning, and instead fired Ghaznavi.

HR Director O'Halloran testified that, without exception, "[p]eople who leave cash unattended are terminated" if she knows about it. (Doc. 37-1 at 15, 56:12 to 57:5). When confronted with a case where a manager was not fired for first offense in 2009, O'Halloran testified that the policy was not consistently enforced until March of 2011. (Doc. 37-1 at 15, 55:20 to 57:5).

Notwithstanding O'Halloran's testimony, numerous managers in the Florida region violated the cash handling policy after March of 2011 but were not discharged for their first violation, as Ghaznavi was. In discovery which Defendant refused to provide until ordered to do so by this Court

(Doc. 28), Defendant produced records showing that forty-nine (49) managers in Thompson's region

have been written up for cash handling violations during 2012-14 but not discharged.  (Doc. 48-3).

Among these managers are several who left cash unattended but were not discharged:

• Bessie Ann Turk, a Store Manager, "left the office with the deposit unattended" on October 12, 2013 and was warned, as Craft warned Ghaznavi, that any recurrence would result in termination (Doc. 48-3 at 24).

• Carolyn L. Kindle, a Store Manager, "left the bank deposit insider her desk unattended in the back office" in May of 2012, but was merely warned that future violations 'may result in demotion or termination." (Doc. 48-3 at 4).

• William J. Andrews, a Store Manager, on October 16 and 17, 2014 took money out of the safe, put it in a file cabinet and left it unattended while he "leaves the office on several occasions," but was merely warned that the next violation will result in "a weeks suspension or up to termination." (Doc. 48-3 at 47).

• Barbara McCabe, a Store Manager, violated cash handling procedures by leaving store funds unsecured on May 31, 2014, but was merely given a "counseling." (Doc. 48-3 at 41).

Additional evidence of pretext is found in the list submitted by Defendant of 31 employees

who were allegedly terminated for leaving cash unattended.  (Doc. 32-1 ¶ 5; Doc. 32-3 at 2).

Although they all were eventually discharged, two of them – Elizabeth R. Parker (Doc. 32-3 at 21;

Doc. 37-7; 37-8) and A.Z. Ahsan (Doc. 32-3 at 11; Doc. 38-23) – had previously left cash

unattended but were not fired for their first violation of the policy, as Ghaznavi was.

These employees are similarly situated to Ghaznavi for all relevant purposes in that, like

Ghaznavi, they were serving as store managers in the Florida Division when the violation occurred

and, like Ghaznavi, they were discharged for the same infraction – leaving cash unattended.

Defendant does not claim that there was any other reason for Ghaznavi's discharge.  (Doc. 31 at 15).

Defendant's failure to discharge these numerous employees for leaving cash unattended is powerful

evidence that its proffered reason for discharging Ghaznavi was a pretext for discrimination.  Even

if all of these employees should somehow fail to be treated as comparators, their treatment would still

be evidence that (1)Defendant did not have a uniform policy of firing for leaving cash unattended, (2) that it let numerous violators off with a warning, (3) that Market Manager Craft acted withini the scope of establish practice in giving Ghaznavi a warning for his violation; and that (4) Thompson went out of her way to overrule Craft's appropriate action and force Ghaznavi's dismissal.  Under these circumstances, Defendant's proffered reason is unworthy of credence.

 Additional evidence of pretext includes the following:

- Thompson's telling Ghaznavi at their first meeting that she did not like Pakistanis, and her later reference to him as "Paki," a derogatory epithet for a person of Pakistani or South Asian ancestry.  (http://www.thefreedictionary.com/Paki) (last visited 3-27-15).

- Thompson's frequent displays of personal hostility to Ghaznavi, such as calling him, "Hey, you," responding to good news about the store by accusing Ghaznavi of "fishing for a complement" and stating he would not get one from her, and her unfounded haranguing of Ghaznavi regarding his hours.

- Thompson's instructing store employees not to support Ghaznavi and setting him up for discipline when the Assistant Manager stopped doing cigarette price surveys.

- Thompson's installing a video camera in Ghaznavi's office as soon as he began to use the office, when no camera had been there previously.

- The fact that contrary to Thompson's negative assessment of his performance, Whitaker, Ghaznavi's mentor and trainer, who worker with him every day for two to three weeks continuously, concluded that he was performing well.

- The fact that, contrary to Thompson's negative assessment of his performance, Ghaznavi passed all the objective inspections and audits by neutrals with flying colors.

 Thus has Ghaznavi established that there are genuine disputes as to material facts,  precluding summary judgment, on his discriminatory discharge claim.

## Legal Argument – "Convincing Mosaic of Circumstantial Evidence"

 The McDonnell Douglas framework is not the only way to prove disparate treatment.  Where an employee fails to make out a *prima facie* case of discrimination under that framework, summary judgment is still not appropriate unless there is no other evidence that discrimination is present.

Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2010) (citing cases).  In particular, a "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  Id. (citation and internal quotation marks omitted).

In Smith, the plaintiff attempted to prove his case through comparators.  Although the court found the proposed comparators were not sufficiently similar to the plaintiff, it still vacated the summary judgment order based on the totality of the circumstantial evidence.  Subsequent to the Smith decison, numerous courts in our circuit have applied its holding to deny summary judgment where plaintiff was unable to establish a *prima facie* case with comparator evidence.[8]  Similarly, even if the comparator evidence is somehow found to be necessary but inadequate here, there is a similar "convincing mosaic of circumstantial evidence" which permits the inference of discrimination.

### Legal Argument – Demotion

Ghaznavi was effectively demoted when Thompson refused to return him to his Market Manager position and filled it with the white trainee, John Rowland, on April 19, 2013.[9]

---

[8]Hamilton v. Southland Christian School, 680 F.3d 1316, 1329 (11th Cir. 2012) (though the plaintiff did not produce comparator evidence, summary judgment is reversed because she presented "enough circumstantial evidence to raise a reasonable inference of intentional discrimination"); Chapter 7 Trustee v. Gate Gourmet, 683 F.3d 1249, 1255-56 (11th Cir. 2012) (though plaintiff did not identify an appropriate comparator, summary judgment for defendant is reversed where plaintiff produced "non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination and thereby create a triable issue") (citations and internal quotation marks omitted);  King v. Volunteers of America, 502 Fed.Appx. 823, 827-28 (11th Cir. 2012) (though plaintiff was unable to identify a similarly situated comparator, evidence of racial statements by manager, leading to discharge by another manager acting as his "cat's paw," was sufficient to survive summary judgment); Jackson v. Checkers Drive-In Restaurants, 2011 WL 3171812, at *4 (M.D. Fla 2011) (summary judgment denied where plaintiff failed to identify "comparator" but presented other circumstantial evidence sufficient to create a triable issue).

[9]In addition, Thompson decided a week later, on April 26, 2013, to formally demote Ghaznavi to the Store Manager position.  *Supra* at 12.  This decision was not implemented only because Thompson discharged him a few days later. Although not fully implemented, the

The <u>McDonnell-Douglas</u> analysis is similar to that for the discharge claim.  In response to the *prima facie* case, Defendant's proffered reason for its action is "poor job performance and training." (Doc. 31 at 15).  As to pretext, the comparators for the discharge claim are not directly relevant, and Plaintiff relies instead on the hostile and racist behavior of Thompson, the fact that Ghaznavi's trainer (Whitaker) testified that he had done an excellent job with respect to his training and performance, Thompson's undermining Ghaznavi by telling store employees not to support him, and the fact that the objective, neutral performance measures were all contrary to Thompson's negative and biased assessment, and did not support the demotion.  As such, there are disputed material facts which preclude summary judgment on this claim as well.

### Legal Argument – Retaliation

Retaliation claims are cognizable under Title VII, 42 U.S.C. §2000e-3(a), as well as the 1866 Civil Rights Act, 42 U.S.C. §1981.  <u>DBOCS West v. Humphries</u>, 553 U.S. 442, 445-46 (2008).  As Defendant correctly states, the elements of a retaliation claim are protected activity by the employee, materially adverse action by the employer, and a causal connection between the two events, such that the protected activity is a but-for cause of the adverse action.  (Doc. 31 at 19-20).

Plaintiff filed an EEOC Charge against Defendant on March 25, 2013, alleging discrimination by Thompson; O'Halloran and Thompson were aware of it by April 1 or 2.  *Supra* at 11.   Shortly thereafter, on April 19, 2013, Thompson commenced a series of unfounded adverse actions:  refusing to return Ghaznavi to his Market Manager position, filling it with another employee, and finally, on April 30, contriving to discharge him.  A series of retaliatory acts begun shortly after protected

---

demotion decision had been made and caused actual harm to the Plaintiff.  For example, if he prevails at trial, any order of reinstatement would subject him to the immediate effect of that decision when he reports for work.  Moreover, even if he is not reinstated, Defendant could argue that any award of back pay should be based on the lower store manager rate, if the legality of the decision to demote is left unresolved.

activity is strong evidence of causation.  <u>Bass v. Board of County Commissioners</u>, 256 F.3d 1095, 1119 (11th Cir. 2001).   The fact that Defendant took these adverse actions despite evidence from numerous sources, other than Thompson, that Ghaznavi was performing satisfactorily further adds to the evidence of causation.

Thus are there genuine disputes of material fact as to whether Thompson's retaliatory animus was a but-for cause of the discharge, precluding summary judgment on Plaintiff's Title VII and Section 1981 retaliation claims.

Wherefore, Plaintiff prays that Defendant's Motion for Summary Judgment be denied in full.

s/ Peter F. Helwig
Peter F. Helwig
Trial Counsel for Plaintiff
Florida Bar No. 0588113
Harris & Helwig, P.A.
6700 South Florida Avenue, Suite 31
Lakeland, FL  33813
Telephone:  (863) 648-2958
Facsimile:  (863) 619-8901
Email: pfhelwig@tampbay.rr.com

Kathryn S. Piscitelli
Of Counsel to Harris & Helwig, P.A.
Florida Bar No. 368598
P.O. Box 691166
Orlando, FL 32869-1166
Telephone:  (407) 491-0143
Primary email: kpiscitelli1@cfl.rr.com
Secondary email: kpiscitelli@tampabay.rr.com

**ATTORNEYS FOR PLAINTIFF**

**Certificate of Service**

I hereby certify that the foregoing was filed on March 30, 2015 with the ECF system which will provide an electronic copy to V. Stephen Cohen, Esq. and Christina K. Ramirez, Esq., Bajo, Cuva, Cohen & Turkel P.A., 100 North Tampa Street, Suite 1900, Tampa, Florida 33602-5853.

/s/ Peter F. Helwig