Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
Case No.: 8:41-CV-755-t-33AEP

SHARIQ GHAZNAVI,
    Plaintiff,
-vs-
CIRCLE K STORES, INC.,
    Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF:  ARNOLD WOLBERG
DATE TAKEN:    April 13, 2015
TIME:         9:00 a.m. - 10:05 a.m.
PLACE:        390 North Orange Avenue
                Suite 2300
                Orlando, Florida 32801
TAKEN BY:     The Defendant
REPORTED BY:    Shelley N. Troise, Registered
                Professional Reporter and
                Notary Public

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Page 2

1  APPEARANCES:
2  PETER F. HELWIG, ESQUIRE
   Law Office of Harris & Helwig, P.A.
3  6700 S. Florida Avenue
   Suite 31
4  Lakeland, Florida 33813
5      Appearing on Behalf of the
      Plaintiff
6
7
8  BRAD F. BARRIOS, ESQUIRE
   Bajo Cuva Cohen & Turkel, P.A.
9  100 North Tampa Street
   Suite 1900
10 Tampa, Florida 33602
11     Appearing on Behalf of the
      Defendant
12
13
14 ALSO PRESENT:
   Shariq Ghaznavi
15
16
17
18
19
20
21
22
23
24
25

Page 3

1             I N D E X
2  TESTIMONY OF ARNOLD WOLBERG
3    Direct Examination By Mr. Barrios    04
4  CERTIFICATE OF OATH                44
5  CERTIFICATE OF REPORTER           45
6  ERRATA SHEET                      46
7  Notification Letter               47
8        - - - - - -
9            E X H I B I T S
10 1 (Declaration of Arnold Wolberg)    30
11
12       S T I P U L A T I O N S
13     It is hereby agreed and so stipulated by and
14 between the parties hereto, through their respective
15 counsel, that the reading and signing of the
16 transcript is expressly reserved by the Deponent.
17       - - - - - -
18
19
20
21
22
23
24
25

Page 4

1           PROCEEDINGS
2           * * * * * *
3      THE REPORTER:  Do you swear or affirm that
4  the testimony you're about to give will be the
5  truth, the whole truth, and nothing but the truth?
6      THE WITNESS:  I do.
7        DIRECT EXAMINATION OF
8          ARNOLD WOLBERG
9  BY MR. BARRIOS:
10     Q.  Please state your full name for the record?
11     A.  Arnold J. Wolberg.
12     Q.  Mr. Wolberg, my name is Brad Barrios; and I
13 represent Circle K in a lawsuit brought by
14 Mr. Ghaznavi.  You know Mr. Ghaznavi, correct?
15     A.  Yes, I do.
16     Q.  First of all, have you ever had your
17 deposition taken before?
18     A.  No.  My first time.
19     Q.  Let me give you some of the ground rules,
20 explain how the process is going to work.
21     We shouldn't be here very long at all, but if
22 you do need to take a break for any reason, just let me
23 know, I'm happy to let you go.  I'm going to ask you --
24     A.  I have to come back if I go, right?
25     Q.  You do have to come back at some point, yeah.

Page 5

1  I'm going to ask you several questions and
2  the most important thing is that I get a clear response
3  to my questions. You can see that there's a court
4  reporter here transcribing everything that we're
5  saying. So it's important that we don't talk over each
6  other. If you can wait for me to finish my question,
7  I'll give you time to respond as much as you want to
8  respond before I start my next question. Okay?
9      A.  Okay.
10     Q.  Clear?
11     A.  Clear.
12     Q.  The other thing is we need to make sure you
13 give us verbal responses. She can't take down an
14 "uh-huh" or nod of the head very well; is that correct?
15     A.  Yes. I look at you; am I supposed to answer
16 to you, or you?
17     Q.  You answer to me.
18     A.  Got you.
19     Q.  Finally, I want to make sure all my questions
20 are clear for you, that you understand them. Okay?
21     A.  Okay. Yes.
22     Q.  If you don't understand a question, just ask
23 me to rephrase it. I'll do my best; I want to make
24 sure we're on the same page. Okay?
25     A.  Okay.

Page 6

1      Q.  If you answer one of my questions, I will
2  assume you understood it. Okay?
3      A.  Okay.
4      Q.  Fair?
5      A.  Fair.
6      Q.  Mr. Wolberg, do you -- are you currently
7  employed?
8      A.  Yes.
9      Q.  With what company?
10     A.  Direct Tools Factory Outlet.
11     Q.  What do you do for Direct Tools?
12     A.  I am an assistant manager of a retail store
13 here in Orlando, sales, we sell tools, generators,
14 pressure washers. So part of a bigger company called
15 TTI, which is Techtronic Industries, TTI.
16     Q.  Okay.
17         (An interruption was had.)
18     A.  Let me just continue with that. Direct Tools
19 Factory Outlet the company is TTI. I'm employed by
20 Ever Staff Staffing.
21     Q.  Which obviously is a staffing company that
22 helped you locate this job?
23     A.  For six months, four to six months, see if
24 they want you, yes. I actually interviewed with TTI,
25 but they use Ever Staff when they hire people.

Page 7

1      Q.  When did you start with Direct Tools?
2      A.  December 1st.
3      Q.  Mr. Wolberg, what's your home address?
4      A.  1432, it's one word, Brookhollow Drive,
5  Orlando, Florida 32824.
6      Q.  Do you have any plans on moving in the next
7  several months?
8      A.  No.
9      Q.  Now you were previously employed by Circle K,
10 right?
11     A.  Yes.
12     Q.  Do you recall your dates of employment with
13 them?
14     A.  After we were transitioned over from Florida
15 Oil to Circle K, I know it would be November, around
16 November, maybe late October, November, through January
17 of the following year. So that would be 2013 into 2014
18 and I'm estimating. I'm pretty sure that is what it
19 was.
20     Q.  So January 2014 is when you ceased being
21 employed by Circle K?
22     A.  Yes, I resigned.
23     Q.  Why did you resign?
24     A.  Better offer, went to a different job.
25     Q.  What job did you go to?

Page 8

1      A.  Wawa.
2      Q.  As a store manager there?
3      A.  No, as an assistant general manager in
4  training. You go into a training program.
5      Q.  How long were you with Wawa?
6      A.  February about seven months. Could be six to
7  seven, but I'll say seven.
8      Q.  Why did you leave Wawa?
9      A.  I did not -- no longer wanted to be in the
10 convenience store business. Wawa was a great company;
11 treated me well. I was actually approached by someone
12 in the store. And I took a little time off after I
13 left Wawa and I took another job with NTC, National
14 Tobacco Company as a sales rep.
15     Q.  What did you sell for National Tobacco
16 Company?
17     A.  Tobacco.
18     Q.  I didn't know if that was a silly question or
19 not.
20     A.  It was like electronic cigarettes, zigzag
21 cigars, zigzag rolling paper, chewing tobacco. So you
22 would go around to independent stores, not corporate,
23 and you service the accounts.
24     Q.  How long did you do that?
25     A.  Oh, about another six months. I resigned

Page 9

1  from that; too much driving; too much traffic in
2  Central Florida area.
3       Q. I can understand that. And then after
4  National Tobacco Company was Direct Tools?
5       A. You got it. There was a lag there, probably
6  a few months; I just took off, relaxed and then went to
7  work.
8       Q. You mentioned before Circle K you were with
9  Florida Oil?
10      A. I was grandfathered. I was originally BP
11 heretic. I was hired by BP originally. And then
12 Florida Oil came when BP decided to divest. And was
13 rehired or grandfathered in, as they say.
14      Q. You came over in the transition?
15      A. Yes, from Florida Oil, and then from Florida
16 Oil transitioned into Circle K.
17      Q. Did you work with Mr. Ghaznavi at Florida
18 Oil?
19      A. Yes, I did.
20      Q. When did you first meet him?
21      A. Florida Oil.
22      Q. Do you remember when?
23      A. I don't know when the transition date was,
24 but Florida Oil -- so I'm going to say it was almost a
25 year, I think, from when Florida Oil took us to when

Page 10

1  Florida Oil divested us over or sold us to Circle K,
2  maybe 11 months. I don't know; I'm going to say 11.
3  I'm not. . .
4       Q. My question was when did you first meet
5  Mr. Ghaznavi?
6       A. When Florida Oil took us over I met Mr. Ghaz
7  as my new supervisor or market manager, maybe a week or
8  two after the whole transition took place. I was
9  introduced by Florida Oil people to him and was told he
10 was going to be my market manager along with other
11 stores he was going to take. But he would be my market
12 manager. Exchanged phone numbers, how to reach him,
13 what to do in case of this.
14      Q. You were a store manager at that time?
15      A. General manager, yeah, uh-huh.
16      Q. Was Mr. Ghaznavi your supervisor the entire
17 time you were with Florida Oil?
18      A. Yes.
19      Q. And you believe that was approximately one
20 year before the Circle K transition?
21      A. I know it wasn't more than a year. And it
22 could be. We're talking a couple of years ago so. I'm
23 pretty sure one year I'll stick to.
24      Q. So let me ask you first about that. We'll
25 just estimate it as a year that period with Florida Oil

Page 11

1  where Mr. Ghaznavi was your supervisor. How often or
2  on how many occasions did Mr. Ghaznavi visit your
3  particular store?
4       A. In the beginning when I got to know him and
5  he was coming in, always professional with me, I would
6  say, I saw him more often in the first maybe beginning
7  six, eight weeks, maybe two months. And that was more
8  of me understanding him, you know, telling me and
9  communicating to me what Florida Oil expected from us.
10      It was a little bit different the way we were
11 receiving stuff with the back office computer and Ghaz
12 was a whiz at that, getting me trained and up to date
13 to understand how to put this food that we were doing
14 into it, because it was different than what we were
15 doing. We were always on a cost thing; this was more
16 cost retail.
17      I will say at least four months into working
18 with Ghaz I spoke to him more on the phone than seeing
19 him, because I felt, and I know he felt it, I knew what
20 I was doing and he didn't need to come to me. Other
21 people needed more help, so he was spending more time
22 with other managers that were struggling.
23      Q. Sure.
24      A. And I didn't -- I know he'd come in. I would
25 at least see him three times in a month, maybe more,

Page 12

1  but not less than that. And it was more him coming in
2  to -- if I remember correctly, he took the coupons from
3  us to ship the coupons out. He dropped off any
4  additional signage that may have been done by the
5  franchisee, but not really stopping in there any more
6  to -- how can I say it -- put out fires. Which, that's
7  what he was -- not really a fire going on -- but if
8  somebody was struggling or there were problems going
9  on, Ghaz was more needed there with his expertise to
10 take care of it.
11      Q. So is it fair to say that he would visit your
12 store approximately three times per month during the
13 entire year period that you were with Florida Oil?
14      A. On average, yeah, that is fair. That is
15 fair.
16      Q. And you would talk to him on the phone even
17 more than that.
18      A. Oh, yes. Oh, yes. And emails, definitely
19 emails.
20      Q. Have you ever emailed with Mr. Ghaznavi about
21 this lawsuit?
22      A. No.
23      Q. What about text messages?
24      A. No.
25      Q. Now when the Circle K transition took place,

Page 13

1  did Mr. Ghaznavi continue to be your supervisor?
2     A.  Yes.
3     Q.  Who else, if anybody, was your supervisor
4  after the Circle K -- transition with Circle K?
5     A.  Nobody.
6     Q.  No one.  After the transition took place, how
7  often did you see Mr. Ghaznavi in a working
8  environment?
9     A.  In the beginning, I'm going to say the first
10 probably two or three weeks maybe once or twice,
11 because he was going through training with another
12 Circle K marketing rep, if they called them that.  I
13 know he did stop in the store with him a few -- one
14 time he came with him, but he was out getting trained
15 whatever requirements he needed to meet to get that
16 done.
17     And I think when he finally got his
18 certificate and he was qualified, they qualified him
19 for the job, then he was in the store more regularly.
20 I saw him more often.
21    Q.  Which supervisor were you just referring to?
22    A.  I don't know who it was that trained him.  I
23 don't know.  I don't remember that.  I don't know if he
24 had one or two; I don't remember.
25    Q.  Which store did you manage for Circle K?

Page 14

1     A.  St. Cloud.
2     Q.  Other than Mr. Ghaznavi, did other Circle K
3  supervisors come and check in on the status of your
4  store?
5     A.  When you say -- you mean people that were his
6  peers?
7     Q.  Anyone else whether they were his peers or
8  his superiors?
9     A.  Yes.
10    Q.  Who?
11    A.  Becky came.
12    Q.  Becky Thompson?
13    A.  Becky Thompson, yes.  There was a -- before
14 Becky there was whoever, whatever her position was,
15 there was another gentleman that was actually like
16 Becky, but he got transferred to Texas.  I do not
17 remember his name.
18    Q.  Was that Mr. Venuti?
19    A.  Yes, it was.  Thank you very much.  So that's
20 who originally we transitioned over with.
21    Q.  Anyone else?
22    A.  If you want to consider the GC, the
23 contractor that worked for Circle K, when I was getting
24 the store renovated over to Circle K he was in there.
25 He was working for Circle K.  Whoever the man was that

Page 15

1  was training Ghaz did come to my store once.  I have no
2  idea what his name was, not a clue.  And that would
3  be -- right off the top of my head that would be all I
4  remember higher than me or Circle K employees.
5     Q.  During the last couple of years when you
6  worked with Mr. Ghaznavi, did you ever socialize with
7  him outside of a work setting?
8     A.  No, no.  Time out, let me take that back,
9  Florida Oil under the big boss took us out for a
10 Christmas dinner and Mr. Ghaz and other supervisors
11 were there and all the managers.
12    Q.  Sure.
13    A.  So we did go out for a Christmas dinner that
14 they paid for and took us to a beautiful restaurant
15 here in Orlando.  So that was one time we did socialize
16 out of work.
17    Q.  When was the last time before today that you
18 spoke to Mr. Ghaznavi?
19    A.  He called me to remind me about this meeting
20 last night.
21    Q.  Did you two talk about your anticipated
22 testimony at all?
23    A.  Not at all.
24    Q.  Did you talk about the lawsuit at all?
25    A.  Not at all.

Page 16

1     Q.  When did you first learn about this lawsuit?
2     A.  A while back.  I don't know exactly, but it's
3  definitely been -- could even be a year.
4     Q.  How did you learn about it?
5     A.  Ghaz called me.  Ghaz -- let me clarify, Ghaz
6  called me to tell me that he was -- so let's go in
7  order, let me get this in order.  I don't know dates.
8     First of all, I was already gone from the
9  company.  He called me or I called him to see how he
10 was doing.  The first time I made contact with him.  I
11 called him to see how he was doing.  He informed me
12 that he is now a store manager, pretty much.  I says,
13 you got demoted.  He says, no.  He says, I don't think
14 it's a demotion, but feels like it.  I have to prove I
15 know how to run a store.
16    I said, but I thought you were certified.
17 You went through your supervisor training, everything
18 was fine.  And Circle K signed off on you that you're
19 okay to go.  And Becky said he doesn't know how to run
20 a store.  I don't remember exactly what he said.  But
21 he was put into a store and he had to prove himself
22 that he knew how to run a store.
23    My answer to him was, you know how to run a
24 store, no big deal; you'll be back to what you're doing
25 in no time at all.  He felt that way too.  He had no

Page 17

1  problem. He was a little disappointed and upset this
2  happened to him. He knew he could prove what he needed
3  to prove that he wasn't incompetent of running a store.
4      When I was working with him Ghaz knew how to
5  run the register; Ghaz knew how to do these things.
6  There was things he even showed me in the back office
7  that I didn't know. I would get hung up. He would
8  say, go into this one; go into that one. He knew that
9  stuff.
10     Q. What specifically did he show you in the back
11 office?
12     A. How to pull up plan-o-grams. How to do the
13 fuel. Sometimes the fuel was very difficult. And I'm
14 getting into too much here, but we switched over at
15 that time to a ruby system. And the training that I
16 was given in the ruby system was one day. And then the
17 next day to take the ruby information to put into the
18 back office. Some other managers got people from
19 Circle K to show up at their store that morning to do
20 the first report.
21     I didn't get anybody to come to my store to
22 help me with the first report. Again, they said, hey,
23 Arnie's good; he knows what he's doing. I did.
24     I think I called him maybe twice, hey, Ghaz,
25 oh, yes, do this, do that. And then on occasions when

Page 18

1  he was in there I would recap, hey, you told me -- is
2  this the right way I did it? We'd go back and look at
3  it. He goes, you did it fine. Stuff like that.
4      Q. Did you see him use the register?
5      A. Absolutely.
6      Q. At your store?
7      A. At my store, yeah.
8      Q. On how many occasions?
9      A. Are we talking Florida Oil and Circle K?
10     Q. No, not Florida oil. Just Circle K.
11     A. A dozen, maybe more. If the line was long,
12 Ghaz would jump on the other register and ring up
13 customers.
14     Q. Do you remember the dates of those or the
15 date range of those?
16     A. It would have to be somewhere between
17 November and December.
18     Q. All right. So let's go back to my original
19 question about when and how you learned about this
20 lawsuit. You mentioned a telephone call between you
21 and Mr. Ghaznavi, right? And he informed you about
22 what he called the demotion and he had to prove he
23 could run a store.
24     A. He didn't say the word "demotion;" I said
25 that. He never said the word "demotion."

Page 19

1      Q. What he told you, and correct me if I'm
2  wrong, is he was told he had to learn how to run one
3  individual store.
4      A. He said to me she felt that he didn't know
5  how to run a store, not an individual store, just
6  didn't know how to run a store.
7      Q. Did he tell you any other reasons that he was
8  given by Circle K personnel for that assignment? Just
9  that he needed to learn how to run a store; that was
10 the only reason he relayed to you?
11     A. Okay. When he went through his training
12 program and he got certified, I think he said, not
13 think, I know he said to me, she claimed he was
14 supposed to -- the training program was supposed to
15 include running a store and that is why he was told to
16 go run a store.
17     Q. All right. During that same telephone call
18 he obviously didn't inform you about this lawsuit,
19 right?
20     A. That phone call, no.
21     Q. He hadn't filed the lawsuit?
22     A. No, no.
23     Q. So after that telephone call did you come to
24 learn on a different occasion about this lawsuit?
25     A. Yes.

Page 20

1      Q. Can you tell me about that?
2      A. I think he called me -- no, that wasn't for
3  the lawsuit. I called him when I found out about that.
4  He called me when he got let go, terminated. And I
5  kind of was questioning him, like, you're kidding me.
6  And he said he doesn't understand. He got perfect
7  scores on his mystery shops; his inventories were good.
8  Everything was fine, the store was running good. And
9  he was very upset.
10     I think that phone call definitely was not
11 brought up; nothing about a lawsuit on that. I was
12 very upset. I was upset because I like Ghaz. Ghaz is
13 a good person, very professional.
14     I think we talked about at that time, I asked
15 him, hey, you want me to talk to Wawa, see if there's
16 something available for you, and stuff like that. He
17 said, if you can do something for me, appreciate it.
18 There was no opening or anything like that at Wawa at
19 that time.
20     I think it was a couple of months, a few
21 months later is when he called me then to inform me
22 that he was filing a lawsuit.
23     Q. I'm going to jump back in time just a little
24 bit and I want to make sure we clearly have the
25 progression of these phone calls. Okay. At some point

Case 8:14-cv-00755-AEP   Document 52-2   Filed 04/16/15   Page 6 of 12 PageID 792

Page 21

1  did Mr. Ghaznavi inform you that he filed an EEOC
2  charge?
3     A.  I don't -- I can't recall it.  I don't
4  remember that.  He may have; I just don't know what
5  phone call and when, but he may have.
6     Q.  When he called you to tell you that he had
7  been terminated, did he tell you why he was terminated?
8     A.  No.
9     Q.  Did he tell you what reason he was given by
10  Circle K for the termination?
11     A.  I can't recall.  I don't -- basically that he
12  didn't know how to run a store.  I didn't ask; and I
13  don't think he told me, that he didn't know how to run
14  a store.
15     Q.  Did he inform you that he left cash
16  unattended?
17     A.  No.
18     Q.  Did he --
19     A.  Time out.  When you say "cash unattended," he
20  did mention something to me about a bank deposit.  Is
21  that what you're talking about?  I just remember a bank
22  deposit.
23     Q.  Sure.  What did he mention to you about a
24  bank deposit?
25     A.  That it was put in a drawer. and we've all

Page 22

1  done that.  As managers, if I'm walking out of the
2  office and the money is not secure, have I put it in my
3  desk drawer?  Have I opened the drawer and put it in
4  there?  Absolutely.
5     Q.  This was on the call when he informed you
6  that he was terminated?
7     A.  I don't remember which phone call.  When you
8  said "money," I do remember -- and I'm going to assume
9  that that was after he was terminated, yes.
10     Q.  Was he telling you that the bank deposit was
11  the reason he was terminated?
12     A.  No.
13     Q.  He was just telling you that he had left the
14  bank deposit unattended?
15     A.  I think what we were discussing was not why
16  he was let go, what he thought he was let go for.  When
17  I was just asking him what went wrong, what happened.
18  I said, you know how to run a store; you know how to do
19  these things.  I think that did come up.  I heard -- he
20  said something about a bank deposit.
21     Q.  Did he tell you he thought he was let go
22  because he left the bank deposit unattended?
23     A.  No, he didn't say that is why he was let go,
24  no.
25     Q.  So he didn't give you a reason as to why he

Page 23

1  thought he was let go?
2     A.  On that period of time when we were talking?
3  No, he did not give me a reason.
4     Q.  He did later?
5     A.  Yes.
6     Q.  When did he tell you later?
7     A.  When pretty much the lawsuit was going
8  forward then things were discussed.  I was just talking
9  to him about what -- he was telling me why he felt that
10  he was let go.
11     Q.  What did he tell you?
12     A.  The EEOC came up then.  He just felt that she
13  had it out for him.  She didn't like him; call it race.
14     Q.  Who's she?
15     A.  Becky.  I asked did he feel it was kind of
16  racism or something she didn't like about you and stuff
17  like that.  And he said absolutely.
18        Just things that I knew, and I think at that
19  time, I think, or later on, I discussed with him things
20  that I observed, the way that Becky treated him that I
21  saw and heard.
22     Q.  Okay.  I know it's kind of hard to think back
23  because this was a little while ago.
24     A.  Yes.
25     Q.  I want to be clear about what took place on

Page 24

1  the different phone calls, all right?
2     A.  Yes.
3     Q.  If you can remember, the phone call, and I'm
4  going to call it the second phone call.  The first
5  phone call is when he told you about what you termed
6  the demotion, right?
7     A.  I termed the demotion, yes.
8     Q.  And then he later called you to tell you he
9  was terminated, right?
10     A.  Yes.
11     Q.  We talked about that phone call?
12     A.  Yes.  Yes.
13     Q.  Do you know if that was like the day of or
14  shortly thereafter the termination?
15     A.  It was not the day of, I know that.  So it
16  had to be -- I'm going to assume maybe a few weeks
17  after, a week, two weeks.  I don't know.  I don't know.
18     Q.  During that phone call, the phone call where
19  you discussed the termination, did Mr. Ghaznavi say
20  anything about feeling that he was the victim of
21  discrimination?
22     A.  On that one, no.
23     Q.  Did you mention anything about racism or
24  discrimination?
25     A.  Not on the second phone call, no.

6 (Pages 21 to 24)

ANTHEM REPORTING, LLC
www.anthemreporting.com    |    888.909.2720    |    anthem@anthemreporting.com

Page 25

1  Q. All right. Then the third phone call you
2  mentioned a few months later he called you and you
3  talked about the lawsuit.
4  A. He informed me that he filed the lawsuit.
5  Q. And on that phone call you did speak to
6  Mr. Ghaznavi about --
7  A. What I heard and observed.
8  Q. About what you heard and observed from Becky
9  Thompson?
10  A. Yes.
11  Q. And what did you tell him as far as what you
12  heard and observed?
13  A. When she would come to the store and Ghaz was
14  there, I was called sir; she would always say "sir" to
15  me. And she'd always say, "hey, you," to him. Hey
16  you, come over here. Just for no reason, that is how
17  she addressed him as, "hey you."
18  Q. On how many occasions were you, Becky
19  Thompson and Mr. Ghaznavi in the same store together?
20  A. It was mostly because of the switch over they
21  were doing, taking it down and remodeling it to the
22  Circle K, three to five times. Three or five, max
23  five, but definitely three to five.
24  Q. For how long each of those times?
25  A. Gees, it could be 30 minutes, could be -- I

Page 26

1  think the most was maybe two hours.
2  Q. How many times did you hear Ms. Thompson call
3  out to Mr. Ghaznavi, "hey you"?
4  A. On every occasion she was in the store. I
5  couldn't tell you how many, but every time she came to
6  the store, yes.
7  Q. Did you ever hear her use his proper name?
8  A. In front of me, no.
9  Q. Other than calling out, "hey you," to him,
10  what else did you discuss -- and I'm still talking
11  about in the context of his telephone call with
12  Mr. Ghaznavi?
13  A. I then brought up -- and I know he didn't
14  hear it -- but I remember a time me and Ghaz were
15  walking the store, it was a big thing with Circle K
16  out-of-stocks. And that he was in the store and I said
17  to Ghaz, hey Ghaz, take a walk with me around the
18  cooler here, let's look at the out-of-stocks so in case
19  she brings it up, I'm fully aware of it. He was
20  walking with me and we were looking. And I heard, "hey
21  Paki."
22       He didn't respond. I didn't respond. She
23  was on the other side maybe about 30 feet; she was by
24  the front windows; we were by the cooler. There were
25  gondolas in between us. And then came, hey, you, come

Page 27

1  over here, which he then responded to that; he knew she
2  was calling him because that is how she addressed him.
3  Q. You said you know Mr. Ghaznavi didn't hear
4  that?
5  A. Neither one of us turned around.
6  Q. But the reason you said you know he didn't
7  hear it is because he didn't react to it?
8  A. He didn't react to it. I think saying
9  something like that, knowing Ghaz, I don't think he
10  would have accepted that. I think that would have been
11  crossing a line. Again, my feelings of that. That is
12  me.
13  Q. Has he since told you that he did not hear
14  that comment?
15  A. When I said that to him, he told me he didn't
16  hear it.
17  Q. Was there anyone else in the store when that
18  comment was made?
19  A. Customers, and my cashiers, but the cashiers
20  were way on the other side. But there were customers;
21  sure, there were customers in the store.
22  Q. Have you ever talked to anyone else that
23  claims they heard that comment?
24  A. No, I've not.
25  Q. Did you ever say anything to Ms. Thompson

Page 28

1  about making that comment?
2  A. No, I did not.
3  Q. When did you first tell Mr. Ghaznavi that you
4  heard the, "hey, Paki" comment?
5  A. So we're getting back to the phone calls?
6  Q. On that third phone call.
7  A. Thank you. Which is months and months later.
8  Q. Is it safe to say that you first told him you
9  heard that comment after this lawsuit was filed?
10  A. That is, yeah.
11  Q. You didn't tell him on the --
12  A. Prior to me knowing about a lawsuit, no, I
13  did not have this conversation with him.
14  Q. Other than hearing the, "hey, Paki" comment,
15  did you ever hear Ms. Thompson say anything about or
16  any comment relating to Mr. Ghaznavi being Pakistani?
17  A. No.
18  Q. First of all, when you heard, "hey Paki,"
19  what did you understand that to mean?
20  A. It's racist; it's just a racist way to call
21  somebody. I took it to be really rude, inconsiderate,
22  unprofessional, just total -- below me. I was not
23  brought up that way. That is not my beliefs; that's
24  not my upbringing. To address somebody, to say that,
25  even as a joke, it's not even funny.

Page 29

1  Q. You understand it to be short or slang for
2  Pakistani?
3  A. No. "Hey, Paki," is not -- I don't take that
4  to be Pakistani. You may. I take it to be a racial
5  slur. That is just not called for.
6  Q. When you told Mr. Ghaznavi about that comment
7  did he ask if you would be a witness in this lawsuit?
8  A. I don't think on that time, at that point,
9  no. I'm pretty sure, no. I think that came later.
10  Q. What was his reaction to you when you
11  mentioned that you heard that comment?
12  A. Hurtful that I even would say that, that I'm
13  using that to him when I said it. I made it clear it
14  wasn't my feelings.
15      Ghaz is a very professional, passionate
16  person and treats people with -- I met few people in my
17  life that treat people with respect and Ghaz is in that
18  list. He would never ever hurt anybody or say
19  something or be disrespectful to you. I know on some
20  occasions -- and I don't remember some of it. But he's
21  just a compassionate person that would pretty much take
22  his shirt off his back if he had to to help you, if you
23  needed something. That is me knowing him over the
24  period of time that I have.
25      For me to tell him that was very hard because

Page 30

1  I knew it would upset him.
2      (Defendant's Exhibit No. 1 was marked for
3      identification.)
4  Q. Handing you what I've marked as Exhibit 1.
5  Please take a look at this and let me know if you
6  recognize this document?
7  A. Yes, I do.
8  Q. What is it?
9  A. This was what I gave to Peter over the phone.
10  Q. Peter, Mr. Ghaznavi's attorney?
11  A. Yes.
12  Q. You gave to him over the phone, is that what
13  you said?
14  A. Verbally over the phone, yes.
15  Q. You didn't type this up; you dictated it?
16  A. No, I didn't type this up.
17  Q. Did you review it after it was typed up?
18  A. Yes, I did.
19  Q. The second page of this, that is your
20  signature?
21  A. That is my signature.
22  Q. Okay. I would like to look at paragraph
23  five. Just go ahead and read that to refresh your
24  recollection.
25  A. During my employment -- want me to read it

Page 31

1  out loud?
2  Q. You don't need to.
3  A. Okay. Uh-huh.
4  Q. Now you say in paragraph five that you were
5  shocked at the rudeness and hostility that Ms. Thompson
6  showed to Mr. Ghaznavi, right?
7  A. Uh-huh.
8  Q. We discussed the fact that you heard her
9  refer to him as, "hey, you," right?
10  A. Uh-huh.
11  Q. Are there any other instances of rudeness and
12  hostility that form the basis of this paragraph?
13  A. We -- again during this remodel there was a
14  gondola that was put over in the coffee section. And
15  she was in the store that day and she said, sir,
16  talking to me, why is there nothing on there. And I
17  said, I don't know what goes on it. She goes, what do
18  you mean you don't know what goes on it. I said, the
19  GC, the people doing this just built this and put it
20  here.
21      She says, do you know how to get a
22  plan-o-gram. I said, yes, you get it out of the back
23  office.
24      Ghaz was coming and walking over and Ghaz
25  said to her, Becky, the ChampionsGate store has this

Page 32

1  same gondola there and we couldn't pull the
2  plan-o-gram; it's not in the back office.
3      And she said, don't tell me it's not in the
4  back office. It is in the back office. She then
5  proceeded to go to my office, all of us did. She went
6  on the computer to pull up the plan-o-gram and she
7  could not find the plan-o-gram.
8      She then got on her cell phone, called
9  someone at Circle K, I'm assuming marketing, I heard
10  her say, hey, where's the plan-o-gram for this, it's
11  over in the coffee section. And was informed it hadn't
12  been downloaded to the back office computer, what Ghaz
13  told her.
14      And she just was like, well, that is
15  impossible, why is that happening. Kind of arguing
16  with whatever was said with that. But at no point did
17  she say to Ghaz, okay, I'm sorry, or anything like
18  that. Because he did inform her that the thing was not
19  in the back office. I think to just jump on someone
20  like that and not say, hey, I'm sorry, you know, you
21  were right. That never came out. To me that is just
22  rude. And it was hostile. The whole thing, the whole
23  episode of it was just hostile.
24  Q. Anything else?
25  A. I know a time I was in the office, and this

8 (Pages 29 to 32)

ANTHEM REPORTING, LLC
www.anthemreporting.com    |    888.909.2720    |    anthem@anthemreporting.com

Page 33

1  is another paragraph in here, and I don't remember
2  exactly what I was doing, but if it was in there I had
3  something I was taking care of on the computer or even
4  could have been on the phone. And I heard her, she was
5  just outside of my office door, she said, hey, you,
6  tell him to get out of the office, tell the manager to
7  get out of the office. I heard it. So Ghaz was coming
8  my way into the office to tell me to get out on the
9  sales floor. My God, you know. I have stuff I got to
10 do.
11     My cashiers know if they get busy out there,
12 they stick their head in the office, I need a hand,
13 come out and give them a hand. So that whole episode
14 of, hey, you, yelling in the store, tell him to get me
15 out of the office and on the sales floor, again, rude
16 and hostile, yes.
17    Q. Okay. Let's look at paragraph seven.
18    A. Uh-huh.
19    Q. You're describing the incident we discussed
20 where you heard Ms. Thompson say, "hey, Paki," right?
21    A. (Witness nods head.)
22    Q. Can you give me your best estimate of the
23 date you heard that comment?
24    A. I have no idea.
25    Q. Can we try to narrow it down? It was

Page 34

1  obviously while you were still a Circle K, employee?
2     A. Yes.
3     Q. So it was before January 14, is when you
4  left; is that right?
5     A. Okay, yeah. Definitely.
6     Q. Was it towards the tail end of your
7  employment?
8     A. No, it was while the remodel was going on; so
9  that would be the month of December. The remodel was
10 done very very beginning of January, so switch over
11 inside. So it was in December.
12    Q. Do you remember the first half of December,
13 or second half of December?
14    A. No, I do not.
15    Q. All right. Paragraph eight, you state in
16 your declaration that Ms. Thompson said on several
17 occasions, I don't even know why you're a market
18 manager.
19    A. Yes.
20    Q. Is that correct?
21    A. Yes.
22    Q. When did you hear her say that?
23    A. One time for sure was over the phone with
24 him. She was at my store. Again, we switched over to
25 this ruby system for the fuel. My whole system just

Page 35

1  went wacky. People were putting credit cards in the
2  pump. They would pump the gas and then inside the sale
3  turned to cash. Their credit card didn't get charged.
4      People didn't steal the gas; they assumed
5  they put their credit card in the pump and they paid
6  for it. But it actually didn't accept their credit
7  card. It flipped it to cash. I had all these pumps,
8  the girls call me, I had all these pumps showing people
9  need to pay me. There's nobody on the pump.
10     She was in the store, Becky, and I informed
11 her and got on the phone with the help desk. The help
12 desk was trying to get me through this. And she then
13 said, I'm calling Ghaz and she called Ghaz. And I
14 heard her say, I don't even know why you're a market
15 manager. What's going on here; this manager doesn't
16 know what he's doing. That was one occasion it
17 happened on.
18    Q. All right.
19    A. I think another occasion was again when we
20 were walking through the store be it looking for out of
21 stocks, or her saying, this needs to be moved over
22 here, general things. I heard that comment also. I
23 don't know why you're a market manager. I don't know
24 how you became a market manager.
25     There was nothing that he did, that was more

Page 36

1  the GC putting maybe the -- I remember there was a
2  wrong counter top put on, wrong color. What does that
3  have to do with me or him that it's the wrong color,
4  and that comment would come out.
5     Q. Do you remember Mr. Ghaznavi telling you
6  about his initial ride along with Ms. Thompson?
7     A. No.
8     Q. Did Mr. Ghaznavi ever inform you that when he
9  and Ms. Thompson were having lunch at a Subway during a
10 ride along that Ms. Thompson made or conveyed a story
11 about a Pakistani person that she once knew?
12    A. No.
13    Q. He never told you that story?
14    A. No.
15    Q. To this day are you familiar with the story
16 that I'm asking you about?
17    A. No.
18    Q. Did Mr. Ghaznavi ever tell you that Becky
19 Thompson told him that she didn't like Pakistani
20 people?
21    A. That Becky told me?
22    Q. No, did Mr. Ghaznavi ever tell you that Becky
23 Thompson told Mr. Ghaznavi that Becky Thompson didn't
24 like Pakistani people?
25    A. No, never.

**Page 37**

1  Q. And that is true up through today?
2  A. That is true up until today, yes. You are
3  the first to utter those words.
4  Q. All right. Did Mr. Ghaz ever tell you that
5  Becky Thompson told Mr. Ghaznavi that Becky Thompson
6  had a bad incident with a Pakistani person?
7  A. Never.
8  Q. When you heard Becky Thompson call out to
9  Mr. Ghaznavi, "hey, Paki," why didn't you say anything
10 to Mr. Ghaznavi about it?
11 A. Why didn't I say anything to him about it?
12 Q. Yes, at the time.
13 A. Wasn't my place. That was not my place to do
14 that.
15 Q. He was your friend, right?
16 A. No, he was my boss.
17 Q. He was your boss. You worked together for
18 quite sometime, right?
19 A. Uh-huh.
20 Q. You didn't feel it was appropriate for you to
21 tell him what you heard?
22 A. At that time, no.
23 Q. When Mr. Ghaznavi informed you during the
24 first telephone call that we spoke about where you used
25 the term "demotion" --

**Page 38**

1  A. I used it, yeah.
2  Q. -- you didn't tell him during that phone call
3  that you heard that, "hey, Paki," comment, right?
4  A. No.
5  Q. Why didn't you tell him then?
6  A. It had nothing to do with anything at that
7  time. For me, it had nothing to do with it.
8  Q. He never mentioned anything during that phone
9  call about discrimination or anything like that?
10 A. No.
11 Q. When Mr. Ghaznavi called you and informed you
12 that he had been terminated --
13 A. Uh-huh.
14 Q. -- why didn't you tell him during that phone
15 call that you heard the, "hey, Paki" comment?
16 A. Had nothing to do with anything, him being
17 terminated. He pretty much stated he ran the store,
18 did what he had to do, and that she terminated him.
19 That Circle K terminated him.
20     I had my life going. I was working for Wawa.
21 It wasn't anything for me to -- I don't even know if it
22 came in my mind at that time, you know.
23 Q. Had you forgotten about it at that time?
24 A. Not going to say forgotten about it; but it
25 didn't ring a bell to say it; didn't do that. Nothing

**Page 39**

1  clicked to say that. Our conversation didn't have
2  anything to do for me to recall that, I think, with our
3  conversation.
4      MR. BARRIOS: Let me have five minutes.
5      (A break was taken.)
6  BY MR. BARRIOS:
7  Q. Mr. Wolberg, you don't happen to know when
8  Mr. Ghaznavi filed this lawsuit; do you?
9  A. No.
10 Q. Have you ever read the EEOC charge that he
11 filed?
12 A. No.
13 Q. Have you ever read a transcript of his
14 deposition?
15 A. No.
16     MR. BARRIOS: I don't have any more
17 questions.
18     MR. HELWIG: I have no questions.
19     MR. BARRIOS: Mr. Wolberg, you have the
20 opportunity to read this transcript to make sure
21 that it was accurately transcribed; that you
22 weren't misquoted or an answer came out wrong.
23 You can either waive that opportunity or you can
24 read it and that will give you a chance to make
25 any corrections.

**Page 40**

1      THE WITNESS: Can I ask him?
2      MR. HELWIG: My recommendation would be to
3  read it just so you have a chance to look it over,
4  but it's up to you.
5      THE WITNESS: I can't take a copy with me,
6  I'm assuming?
7      MR. BARRIOS: No, it's not going to be ready
8  immediately.
9      THE WITNESS: But I could get a copy?
10     MR. BARRIOS: Right, that is what we're
11 explaining to you. You can get a copy.
12     THE WITNESS: If there's something that is
13 wrong, it's too late.
14     MR. BARRIOS: You will have an opportunity
15 if something came out wrong to change it before it
16 becomes the official transcript.
17     THE WITNESS: I'll scan it, look at it.
18     MR. HELWIG: Just to give you a picture of
19 it, there's a little sheet at the end where you
20 can write down anything.
21     MR. BARRIOS: Where I meant to say the light
22 was green; I actually said it was red, that kind
23 of thing.
24     THE WITNESS: I think there maybe -- and I'm
25 just going to look at that part, where we go

Page 41

1  through the first, second, third phone call, that
2  is the only thing I would say to myself did I --
3  not didn't I answer it truthfully, I did, but what
4  part.
5       MR. BARRIOS: Look, if while we're still on
6  the record, if there's any doubt in your mind, I
7  would rather clarify it now.
8       THE WITNESS: No, I'm okay with it. That is
9  fine. I'll scan it.
10 BY MR. BARRIOS:
11      Q. Let me just ask you again to make sure we're
12 clear. The first phone call I referred to is when you
13 two spoke about him being told he needed to learn how
14 to run a store, right?
15      A. Correct.
16      Q. And you used the term --
17      A. I used the term "demotion" --
18      THE REPORTER: You're both talking at once.
19      A. He did not use that term, no.
20      Q. Just to recap these calls, first call, no
21 discussion of any discrimination.
22      A. Correct.
23      Q. That happened while you were still a Circle K
24 employee?
25      A. No, I was not.

Page 42

1       Q. You were gone already at that point?
2       A. Uh-huh.
3       Q. All right. The second phone call that we
4  spoke about was when Mr. Ghaznavi informed you that he
5  had been terminated?
6       A. Correct.
7       Q. And you said it was somewhere around the time
8  of his termination; you don't think it was the same
9  day.
10      A. Correct.
11      Q. And the third phone call we talked about was
12 when you learned that he had filed the lawsuit, right?
13      A. Yes. Correct.
14      Q. And that is the phone call when you first
15 told him that you heard the, "hey, Paki" comment?
16      A. Yes.
17      Q. Okay?
18      A. Yes.
19      Q. All right. I think we're clear. You still
20 have the opportunity to read it.
21      A. Yeah, I'll do that.
22      MR. BARRIOS: The only thing is we have a
23 reply due in a couple of days. I don't know if we
24 spoke to you about getting an expedited
25 transcript.

Page 43

1       THE REPORTER: Yes.
2       MR. BARRIOS: Then we're all set.
3       THE REPORTER: They're ordering it expedited;
4  do you need a copy?
5       MR. HELWIG: I don't need it expedited, but I
6  would like a copy.
7  (The deposition was concluded at 10:02 o'clock a.m.)
8                    * * * * * *

Page 44

1              CERTIFICATE OF OATH

3  STATE OF FLORIDA
4  COUNTY OF ORANGE

6       I, SHELLEY N. TROISE, RPR, Notary Public, State
7  of Florida, certify that ARNOLD WOLBERG personally
8  appeared before me on April 13, 2015 and was duly
9  sworn.
10      Signed this 13th day of April, 2015.

                         _____
14                       SHELLEY N. TROISE, RPR
                         Notary Public - State of
                         Florida
15                       My Commission No. #DD762143
16                       Expires: MAY 21, 2016

## Page 45

```
 1            CERTIFICATE OF REPORTER
 2
 3    STATE OF FLORIDA
 4    COUNTY OF ORANGE
 5        I, SHELLEY N. TROISE, RPR, Court Reporter and
 6    Notary Public, certify that I was authorized to and
 7    did stenographically report the deposition of ARNOLD
 8    WOLBERG, that a review of the transcript was requested,
 9    and that the foregoing transcript, pages 04 through 43,
10    is a true and accurate record of my
11    stenographic notes.
12        I FURTHER CERTIFY that I am not a relative,
13    employee, attorney, or counsel of any of the parties,
14    nor am I a relative or employee of any of the parties'
15    attorney or counsel connected with the action, nor am
16    I financially interested in the action.
17        DATED this 13th day of April, 2015.
18
19
20            _____
              SHELLEY N. TROISE,
21            REGISTERED PROFESSIONAL
              REPORTER
22
23
24
25
```

## Page 46

```
 1
 2                  ERRATA SHEET
 3    IN RE:   Ghaznavi v. Circle K Stores, Inc.,
      CASE NO.: 8:14-cv-755-T-33AEP
 4    DEPONENT: Arnold Wolberg
      DATE:    April 13, 2015
 5
 6    PAGE    LINE          CORRECTION
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    Date        Witness_____
```

## Page 47

```
 1                   April 13, 2015
 2    Arnold Wolberg
      c/o Peter F. Helwig, Esquire
 3    6700 S. Florida Avenue
      Suite 31
 4    Lakeland, Florida 33813
 5    Re: April 13, 2015 Deposition of Arnold Wolberg
          Shariq Ghaznavi v. Circle K Stores, Inc.
 6
 7    Dear sir:
 8        This letter is to advise that the transcript of
      the above-referenced deposition has been completed and
 9    is available for review. Please make arrangements to
      read and sign or sign below to waive review of this
10    transcript.
11
12        It is suggested that the review of this
      transcript be completed within 30 days of your receipt
13    of this letter.
14
          The original of this transcript has been
15    forwarded to the ordering party and your errata, once
      received, will be forwarded to all ordering parties.
16
17                   Sincerely,
18                   Shelley N. Troise, RPR
19    cc: Peter F. Helwig, Esquire
          Brad F. Barrios, Esquire
20
      WAIVER:
21    I, _____, hereby waive the reading &
      signing of my deposition transcript.
22
23    _____      _____
24    Deponent Signature            Date
25
```